We'll hear argument first this morning in Case 1486, the Equal Employment Opportunity Commission v. Abercrombie & Fitch Stores. Mr. Gershengorn? Mr. Chief Justice, and may it please the Court, the Tenth Circuit imposed two requirements on religious accommodation claims that eliminated liability for Respondent's refusal to accommodate Ms. Eloff here. First, that the applicant herself verbally requests the accommodation, and second, that the employer know, rather than just correctly understand, the need for an accommodation. Neither requirement is sensible. What is the difference between knowing and correctly understanding? Your Honor, the testimony, it's a fair question. The Tenth Circuit perceived a difference. What the testimony was was that Ms. Cook assumed that the Ms. Eloff needed to wear the headscarf because she was religious, that she figured that the headscarf signified that it was a religious headscarf, and that she figured it was a religious headscarf. What the Tenth Circuit said was that was insufficient. What was needed was actual knowledge. Our position is that when you figure, when you assume, when you – when it signifies to you that a religious accommodation is needed, that is sufficient notice for an employer to be on notice. Sotomayor, I'm sorry. Does that subjective or is it even relevant? Meaning the issue is whether they failed to hire her because of a religious practice. Whether the person thinks it is, is the issue. I mean, that's why they acted. That's right, Your Honor. We think that's what makes this a particularly straightforward case. What the employer did here was act upon the assumption that Ms. Eloff needed to wear the headscarf for religious reasons, and yet that later claimed refuge that it didn't have sufficient knowledge or certainty to actually have initiated the accommodation process that Congress wanted in Section 2000e2. Kennedy, back to Justice Scalia's question. I think there's substantial force to your argument that the employee doesn't have to mention this first. But why do we import the term understand instead of know? In a treatment case, the whole idea is that prohibited action was taken because of religion. So you knew. Why are you making it so confusing? Your Honor, I – with respect, it's our position, it's the Tenth Circuit that's made it confusing. What the Tenth Circuit has done is said, when you know – when you are – Your position, your statement that you opened with is that he must understand. You stay away from the word know. Justice Scalia asked you why you did that, and I can't understand your answer. So the answer, Your Honor, is we think that there is sufficient knowledge, notice, when somebody understands that – when somebody assumes that a practice is religious and then acts upon it, that that is sufficient. What the Tenth Circuit said was that is not sufficient, that what is needed is something more approaching certainty. But that's not – So that does raise the question, if yours is less than certainty, how much less than certainty is it? I mean, suppose I'm an employer and I say, you know, I don't honestly know. I think. You know, it's two out of three. Is that sufficient? So, Your Honor, I think that if I could explain how these cases come up, I think it will – the best way to answer your – that would be the best way to answer your question. The answer, in a situation like this, in which it's an applicant applying for a position and the employer suspects, thinks, two-thirds, that there's a religious problem, a religious conflict, the employer has two options. It can assume there is no conflict, in which case they make the hiring decision on the merits. In that case here, Ms. Eloff would have been hired. Alternatively, if the employer feels like there's enough concern to – about how Ms. Eloff would be able to perform, they can start a dialogue. That's what Congress intended. What they can't do is what they did here and assume through a stereotype that there was going to be a need for accommodation, and then say, having assumed that, I don't have any obligation to actually try to accommodate. Kagan. Is that true even if it's under 50 percent? In other words, say the employer says, you know, I really don't know, but I think that there's like a, you know, 50-50 chance or even a 40 percent chance that this has religious, that this practice is religious, and I don't really feel like getting into all this accommodation stuff, so I'm not going to hire this person. So I think, Your Honor, that that's what they cannot do. But I do think that I'd like to – So it doesn't really depend on what the percentage chance is. So I think that I – It could be certain, it could be less than certain, it could be a lot less than certain, as long as the employer says, there's some chance and I'm not going to hire or promote or fire or whatever because of that chance. So, Your Honor, I would like to try to separate out two different – two different situations that could arise, only one of which we think arises commonly. One is that the employer has a work rule and is concerned that the applicant before won't be able to comply in the future with the – after being hired, with the work rule, because they perceive that the person is religious. I think the dilemma that Your Honor is posing is really a false one there. If the employer really has a very small understanding or thinks it's very unlikely that the employer will be religious, the right thing for the employer to do is to assume that there isn't a religious problem, to not engage in the stereotyping, and assume that the person could comply, as they would with somebody who was wearing a headscarf or something else for not being religious. Sotomayor, I'm not sure I understand why you're fighting Justice Kagan's question. Isn't the issue the reason that they acted? They refused to hire someone because they had a 1 percent belief that they had a religious – pardon the pun – a religious belief that they wouldn't accommodate. So, Your Honor, I don't intend to fight Justice Kagan's hypothetical. And on the facts of this case, I think it's really quite easy. But the reason why I'm trying to separate the two is because I think the situation here is the easy case. And I'll get to why the hard case and why I'm sort of fighting Justice Kagan's hypothetical. Scalia, you're confusing me enormously. Okay. Would you tell me what it is you want? I mean, you just say, he understands. That doesn't do anything for me. What – he understands, knows, believes, suspects. What other verbs do you need? So, Your Honor, the test that the Courts of Appeals have adopted for more than two decades, which is the test that we asked this Court to adopt, is that the employer needs sufficient information from any source about the employee – about the applicant's religious needs – that to permit the employer to understand the existence of a – that's the test that the Courts of Appeals have been applying for decades. I don't care what they view. That doesn't make any sense to me. But, Your Honor, the reason why I think it makes sense in this case is because if it's sufficient knowledge for you to actually act upon it. Remember, if they – if – the critical point here for us is if they had not – if the employer had not assumed that this was religious, had not believed it, they would not have hired her. The default rule for I'm not sure is hire. Ginsburg, didn't she – the person, the first-line person responsible for hiring, didn't she say to the district manager, I think she's wearing this headscarf for religious reasons, and that's why I'm checking it out with you? The answer she got back was, it doesn't matter whether it's religious reasons. We don't – we don't accommodate people who wear headscarves. That's right, Your Honor. So it seems that the district manager is – his point of view is headscarves are out. This particular woman was wearing one for religious reasons, but it doesn't matter what reason. We don't accommodate headscarves. I think that's right, Your Honor, and that's exactly what Congress said when it enacted these provisions. They didn't want to happen. There's no law against such a rule. Any employer can have a rule. We don't allow headscarves. And until someone applies for a job who, for a religious reason, wants to wear a headscarf and the employer knows that it's for a religious reason, or suspects or believes or understands, whatever verbs you want to use, there's been no violation of the law. You can have that rule. Absolutely. We do not allow our employees to wear headscarves. Nothing wrong with that rule. That's correct, Your Honor. But once Justice Kagan said that – So the mere fact that this supervisor said that doesn't prove a violation by the employer. Well, I don't agree with that, Your Honor. I think once the – once it's clear that the employee is – needs an accommodation of that rule, that's exactly what Title VII requires. That's what the Court addressed in Hardison. It was a neutral rule that you had to work on the Sabbath. That's right. But that said – But that supervisor did not have that knowledge. Oh, no, Your Honor. That's not correct. And I took from Justice Ginsburg's hypothetical question that what we believe to be the case that Cook conferred, conveyed to her supervisor, Johnson, that it was for a religious reason. There's a dispute in testimony about this. But what Cook said – and remember, summary judgment has now been granted against us. So the evidence read in our favor. What Cook said was, I told Johnson that it was for religious reasons, and Johnson said, if we allow this, then someone will paint themselves green and call it a religion. We can't allow it. So the Court decides the question on the assumption that the decision-makers knew – well, and your solution that you suggested is that if there's some doubt, the employer should begin a dialogue, I think is what you're saying. But I think that may promote stereotypes to a far greater degree than what you're objecting to. I mean, let's say you have someone of Middle Eastern appearance who shows up for the interview with a beard. And the employer, like Abercrombie and Fitch, they don't like beards. They don't want their models, as they call them, having beards. But he doesn't know if the beard is there for a religious reason or not. So you think it's better for him to sit there and start asking this applicant questions he would not ask anyone else about religion? Why are you wearing a beard? Is there a religious reason for that? It seems that your solution causes more problems. So, Your Honor, I have two responses that I'd like to say. First, I don't think it's right that the solution causes more problems, because I don't think that what Congress would have preferred is that the person not get hired, then that the dialogue be begun. If those are the two options, I think it's clear Congress wanted an accommodation of the religious practice. But I also think that Your Honor's hypothetical points out quite nicely that it's a somewhat artificial situation here. What the employer is saying is, I don't want a beard when the person is on the floor. But that's not a reason not to hire someone who walks in the door with a beard. The New York Yankees, for example, have for decades had a no facial hair policy. But they don't not pursue free agents that wear beards. They assume that those free agents can shave once they get to Yankees.  Roberts, it's reasonable for an employer to say, look, I don't want to buy in to some problem with a guy who has a beard. I'm going to say, can you shave it? He's going to say no, or he's only going to shave twice a week. I mean, isn't it reasonable to say, let's say, I don't care if it's religious or religious reason or not. The guy shows up with a beard, I'm not going to hire him. So, Your Honor, that's the hard question I think Justice Kagan was asking, and I do think that's a trickier question. If your policy is not, I have a work rule that I'm concerned you won't be able to comply with in the future, then I think for all the reasons I've said thus far, it's all set. If the question is, when someone comes to my office with a beard and I just think it's unkempt, I don't like it, I'm not going to hire them regardless of whether they could comply, I think that's the situation that presents this, is it one-third, is it two-thirds. I think that's a hard question. It's not the one presented here, and quite candidly, it's not the kinds of cases that we actually see. They much more are the work rule. Scalia, you could avoid those hard questions, whether it's understand, believe, suspect, by adopting the rule that the court of appeals adopted here, and that is, if you want to sue me for denying you a job for a religious reason, the burden is on you to say I'm wearing the headscarf for a religious reason, or I'm wearing the beard for a religious reason. That avoids all problems. Once you notify the employer that it's for a religious reason, you got them. So you're over. Ginsburg-Ginzburg Did the employer tell her that it had this look policy that a headscarf would violate? How could she ask for something when she didn't know the employer had such a rule? That's exactly the problem, Justice Ginsburg, and Justice Scalia, in response to your question. The reason that's insufficient is that it is simply not the case that Respondent as Respondent suggests that the superior knowledge is with the applicant in that situation. The applicant is not on notice of what the work rules are, and indeed, in this situation, the testimony was uncontroverted that Ms. Eloff did not know there was a look policy that prohibited the headscarf. Kennedy Well, this is not the place to get into the facts, but I thought her friend told her to wear at least a colored scarf, so the subject came up. So I don't know. Gershengorn But actually, Justice Kennedy, that's Kennedy Again, we're not fact-finders here. Gershengorn No, I understand, but it's important, Your Honor, because actually that in fact supports our position, because what her friend said was, there's no problem with a headscarf, it just shouldn't be black. And so she then wore the – if anything, she was on notice that there was no problem with the headscarf. So I actually think it cuts exactly the other way. And, Justice Ginsburg, to pick up on your point, what makes it particularly inappropriate, I think, to put the burden on the applicant here is that it's the employer who gets to structure the interview, and in fact, the employer here read some version of the look policy, but did not mention the headscarves. So actually, this was a situation in which the employer itself could have put Eloff on notice, and then it's a very different situation. If the employer says, we don't allow headscarves, and then the employee doesn't say anything, I think that's a very different situation, but to get back to my beard case, is there – if it's someone with a Middle Eastern appearance with a beard, you want the employer to begin some kind of a dialogue. If it's somebody who's not Middle Eastern and has a beard, can the employer assume, well, I don't think that's for religious reasons? In other words, he's going to be asking religious questions of some people based on a stereotype, not others. Sotomayor, why does he have to ask about religious questions? Roberts, could you please answer my question, please? Sure, Your Honor, although part of the answer is that I don't think they – that the employer does. As I've said earlier, the right approach for the employer who really wants to avoid the subject is to assume that the person of Middle Eastern descent, just like the has a beard for personal preference and would be happy to shave if he got the job in order to comply with the work rules. And that is what is critical for it. That is what Congress wanted to accomplish here. So why can't the employer just simply say, we have a look policy that doesn't permit beards? Can you comply with that policy? Absolutely, Your Honor. And that's all they have – they don't have to ask about reasons or no reasons. It doesn't really matter why. Right. So I tried to make clear there are two options. One is the one I gave to the Chief Justice, which is you can assume the person doesn't wear it for religious reasons and then hire them, or if you're concerned about it, you can ask a specific question. The EEOC has made clear that that is not the case. The question is supposed to be why are you wearing a beard? No, the question is we have a work rule that prohibits facial hair on the floor, on the force, on the foot. So that doesn't cover anything that's not immediately apparent by the appearance. You make them have a code of conduct that presumably would go through several pages. Here are all the things we require. Any problem with any of them? So, Your Honor, I actually think that that – this is a – the employer is at no risk of liability if he asks no questions but makes no assumptions and stereotypes. And that's why I don't think what Your Honor is hypothesizing turns out to be a problem in practice. What is going on is that in the mine run of cases that the EEOC brings and that we see in these cases, is you're talking about a work rule. You're talking about you must wear pants at work and the employer has a religious objection, thinks women should wear skirts. You're talking about a no long hair policy. You're talking about groom and garb. And the concern is will you be able to comply in the future? The employer doesn't have to run down those questions. The employer can assume there's no religious problem, can avoid the stereotypes and stereotypes. However, if the employer wishes, what the Court said in Insonia is that a bilateral dialogue is what Title VII is designed to accomplish. And so picking up on Justice Sotomayor's point, you could raise the policy. And this is not a crazy idea. This is what Respondent did. Scalia, he can ask, can you do it? Is that the only religious preference that has to be honored? I can, but you know, really, I would like not to for a religious reason. I guess I could take off my headscarf or whatnot, but it would be very inappropriate, religiously uncomfortable. Is that a are you acknowledging that the only accommodation that has to be made is an I didn't think so. But that is not what this case is about. Because the So you can't ask that. You cannot ask the question you're telling them to ask. Can you do it? Yes, I guess I could, but But that's the exact dialogue that's supposed to happen. That's what this Court said should happen. That's the bilateral dialogue. What Congress wanted when it passed a reasonable accommodation requirement is precisely for the employer and the employee or the employer So she says yes, I could. And then later says, yeah, I could, but boy, it is really uncomfortable for me to do that for religious reasons. Would she still have a lawsuit? Well, she wouldn't have a lawsuit, but she might be able to Yes, I could. She could. Well, if she could, then she was hired. Then when she says actually now it's quite uncomfortable, that's a request for an accommodation and she and the employer need to go into a discussion just like you would if you said I need this time off to attend a religious conversion ceremony, which was at issue in the Ninth Circuit case in Heller. That's just the back and forth of everyday employer-employee relations. Well, couldn't the employer say we have a policy, no beards or whatever? Do you have any problem with that? Why do you have to why does it have to be phrased could you do it? Just say do you have any problem with that? Are you willing to do it? It's a matter I think what the what Title VII is about, what this Court has recognized and what certainly the EEOC has recognized is the actual accommodation back and forth is quite a flexible process. It's designed to be collaborative. And so there isn't a fixed rule you have to phrase it this way or phrase it that way. I think the point is to initiate the dialogue. And I think had that happened here, then we would be talking about a different point in the process about whether there was a reasonable accommodation that could be done and whether it could be done without undue hardship. But that dialogue never happened here. And that is the problem with the case as we see it. And the respondent says that you switched theories in mid-screen, that you started out with a refusal to accommodate theory and then you abandoned that. Is that so? That is not correct, Justice Ginsburg. From the very beginning, our theory has been that the respondent violated Title VII by refusing to accommodate Ms. Eloff. That was the theory that was presented in the complaint. It's the theory we got summary judgment and damages on. It's the theory we defended in the court of appeals. And it's the theory we have preceded under on all of our cases here. There has been no switch. The phrase of religious accommodation appears 14 times in a row. So that's disparate treatment plus failure to accommodate. So they have secretly done the word disparate treatment. I'd like to, if I can avoid a yes-no and just explain our position on disparate treatment, Justice Kennedy. The brief – the phrase used in the brief was that a failure to accommodate is the kind of disparate treatment that Title VII was designed to prevent. We think that is correct and accurate, that what Congress meant to do was put people who needed an accommodation like Ms. Eloff, a headscarf accommodation, on the same footing as people who did not need to wear headgear. That is the sense in which we – this is disparate treatment. However, we recognize that the EEOC and the lower courts have used disparate treatment in another way, which is to say there's a disparate treatment way to prove discrimination, a failure to accommodate theory. We did not – and to highlight the difference, a disparate treatment would be you allow all hats but not religious hats. That's disparate treatment. This is you don't allow any hats but we want to wear a religious hat. That would be a failure to accommodate. We did not at any point in this case abandon or change our theory from the failure to accommodate. What the other side has done is assert not only that we did that, but we did it for some motive because we wish to avoid a 1981A question, a question which no court has ever adopted their theory and which at no point in this litigation have they ever raised. Even though 1981A was the only theory on which we could get damages in the district court, we had a damages trial, and 1981A was the only source of damages. They never raised it. Our pre-trial brief said we're proceeding under 1981A. The district court's pre-trial order listed 1981A. That was the basis of our damages. Sotomayor, I'm sorry, again, I'm a little confused. I didn't know – I read your complaint and it says the Respondent refused to hire Ms. Eloff because she wears a hoofbead and further failed to accommodate her religious belief by making an exception to the Luke policy. I looked at your briefs, I looked at the jury charge, and it seems like the two were always tied. The failure to hire was because they refused to accommodate her. That's correct, Your Honor, and that has been our theory from the very beginning. So the idea that 1981A magically became part of this case when we mentioned the word disparate treatment in our opening brief is just not credible. That has been the theory. They appealed – that's how the damages were done. They never raised it on appeal. They never raised it in the law. Well, suppose they had. Their argument is that you get damages only for intentional. So, Your Honor, no court has ever addressed that, but our position is, and this is how the courts have uniformly applied it, that this is intentional discrimination under 1981A, although it's not a question that's before this Court. The reason for that is 1981A distinguishes between – and this is – I'm sorry, Your Honor. It's in the red brief on page 1A, and it's 42 U.S.C. 1981AA. It distinguishes between unlawful intentional discrimination, not an employment practice that is unlawful because of its disparate impact. The failure to accommodate claim is neither disparate – is not a disparate impact claim, and it is intentional discrimination for exactly the reason that Justice Sotomayor has said. It's the intentional refusal to hire because of a religious practice that you could reasonably accommodate. And it's – this is not, as the amicus briefs – some of the amicus briefs have suggested, just a disparate impact claim. Kennedy, I'm sorry to be up here, because I don't know why you just don't concede that that's a form of disparate treatment. Failure to accommodate is a form of disparate treatment. I don't accommodate you because of your religion. It's disparate treatment. So, Your Honor, as I tried to suggest, I think it is a form of disparate treatment as we've used it in the Act. I just want to distinguish the different theories, because under a disparate treatment approach, there's a – as the lower courts have used it, you would have to show that it was because of the religious nature of the practice that you didn't accommodate. So, for example, again, that I allow hats for everyone, but not if you have a religious hat. That would be a – as the lower courts have called a conventional disparate treatment claim. If I could reserve the balance of my time. Roberts. Thank you, counsel. Mr. Dabrowski. Mr. Chief Justice, and may it please the Court. The premise of the EEOC's argument today, as I understand it, is that Abercrombie acted because of the religious basis for Ms. Eloff's headscarf. That is not correct as a factual matter, and the EEOC's theory in its brief does not depend on any such assumption. The EEOC's theory in its brief is that any time an employer suspects a possible conflict or correctly understands such a conflict, at that point it is on notice and must offer a religious accommodation. And so if you imagine a situation which is not at all a religious one. Sotomayor, I mean, you can't have a religious accommodation if they have a reasonable basis not to. I mean, you follow the statute. You only have to accommodate if it's not an undue burden. That's true. They always have the undue burden defense, but absent an undue burden, they must accommodate and they must depart from a religion-neutral policy based on a mere suspicion of a possible conflict. Sotomayor No, that's not an un – go back to their position. It's very simple because you are mischaracterizing it. Their position is if you believe that someone believe, no or a lot of adjectives, that someone will need a religious accommodation, then and won't comply with your policy, just ask them. Do you have a – just the way Justice Alito said, you know, we don't permit facial hair on the floor. Do you have a problem with that? Justice Sotomayor, as an initial matter, their theory in their brief does not depend on any sort of assumption about whether the applicant would later be able to comply with the work rule or not. Under the theory expressed in their brief, even if an employer like Abercrombie had a policy in which the look policy applied at the interview, you are being assessed at the interview based on your compliance with our dress. Do you think that the – do you think the employee has to say, I'm dressed the way I am for a religious reason? Not necessarily. However, the employer's knowledge has to be traced to the employee in some way. In the typical case, that is going to come directly from the employee because of the individualized and personal nature of religion. Alito, I'm sorry, let's say four people show up for a job interview at Abercrombie. This is going to sound like a joke, but, you know, it's not. So the first is a Sikh man wearing a turban, the second is a Hasidic man wearing a hat, the third is a Muslim woman wearing a niqab, the fourth is a Catholic nun in a habit. Now, you think the employer has to – that those people have to say, we just want to tell you, we're dressed this way for a religious reason, we're not just trying to make a fashion statement. First of all, Your Honor, one aspect of your hypothetical is not a joke, and that is that many of these interviews at Abercrombie are, in fact, group interviews. And I think the reality of the group interviews, where there are multiple applicants at a time. And so I think the reality is it's a lot more difficult than the government imagines to start having these individualized dialogues. But going to your point about those sorts of religious outfits, one can certainly imagine cases in which it is more obvious than others that a particular – the particular garb is likely worn for religious purposes. However, I would direct the Court, if I could, to Joint Appendix 130 and 131, which contain pictures of the sort of headscarf that Ms. Eloff was actually wearing in this case. Those sorts of situations where it's far more ambiguous whether a – whether a particular outward symbol is religious in nature or not will be far more common. Well, that can be the case. But what – I want to know the answer to the question whether the employee has to say I'm wearing this for a religious reason, or whether you're willing to admit that there are at least some circumstances in which the employer is charged with that knowledge based on what the employer observes. No, Your Honor. I think there are some circumstances in which it is certainly more likely than others. But the question before the Court is to devise a rule that's going to apply across the board. Actually, I didn't think that was the question. I thought the question presented was that the Tenth Circuit had said, employer, unless you know from the woman who's applying, from the applicant, unless you receive direct explicit notice that what she wants to wear is based on religion and she wants an accommodation, unless you receive direct explicit notice from her, you're home free, do what you want. Now, in their question presented, they say in the last few words of describing it, we think that's wrong. Now, I agree that we have to say whether that's wrong, and if it is wrong, it would be helpful to say what they have to do. So the SG says, here is what it is. If the employer correctly infers, correctly understands, and I would add, or correctly believes that a practice as religious in an accommodation is necessary, that's it. Then he has to accommodate unless he has one of the excuses under the statute, et cetera. Okay. What's wrong with that? Justice Breyer, I think what you've just described is a rule for all cases, and it's one that is entirely unadministrable for courts, employers, and applicants alike. It is unadministrable to say that if the employer believes, thinks, this woman is religious and needs an accommodation, and he's right, well, do something, unless you have an excuse. Why is that unadministrable? Your Honor, I believe that's unadministrable because the EEOC does not explain what level of certainty is required for a belief versus suspecting. Oh, no. You have to prove, this is correct, you have to prove he has a belief. Now, we probably, in 250,000 Federal cases a year, of those, say, 80,000 that go to trial, proving that somebody has a belief or other is probably at issue with 90 percent of them. Now, I'm making that up, that number. But nonetheless, I don't think it's uncommon in the law that you have to prove that somebody believes something. So we say the standard of proving belief is like in any other case. I don't think this is like any other case, because you're dealing with you're dealing with something, religious belief, which is inherently personal to the individual. And to charge employers with Title VII liability and require them to come to an understanding of whether a particular practice is religious or not is such. Sotomayor, suppose an employer just doesn't want to hire any Jews, and somebody walks in, and his name is Noah Goldberg, and he looks kind of Jewish, and the employer doesn't know he's Jewish. No absolute certainty, and certainly Mr. Goldberg doesn't say anything about being Jewish, but the employer just operates on an assumption that he's Jewish, so no, he doesn't get the job. Is that a violation? That is a disparate treatment violation of Title VII. That has got to be against the law, right? It doesn't matter whether the employer – it doesn't matter whether the employer knows it to an absolute certainty, right? Absolutely, because in that situation, what's relevant is the employer's intent. If the employer intends to discriminate on the basis of religion, then that's a Title VII violation. What's going on here, however, is that the employer seeks to apply a religion-neutral dress code. Religion, according to Johnson, has to be a violation of Title VII. Ginsburg, you would be right if all of the Title VII did was prevent religious discrimination, but it makes a religious practice, a refusal to accommodate a religious practice, is itself a violation of Title VII. So we have to – it's – and that was done deliberately, was it not, so that religious practices would have to be accommodated? Yes, Your Honor, and two points in response to that, if I may. One, we're not contending that religious practices don't have to be accommodated. What we are contending as an initial matter is that an employer does not intentionally discriminate on the basis of a religious practice by enforcing a religion-neutral dress code that would have been enforced. But the thing about my question was, is that what this statute does is to say that if you are, in fact, wearing a headscarf for religious reasons, that your neutral policy really doesn't matter. It only matters if you – there's an undue burden and you really can't make an accommodation. But except for that, it really doesn't matter. You just have to hire me, even if I'm wearing a headscarf. And so the fact that you don't know that I'm wearing a headscarf for religious reasons, that you only kind of assume that because most people do wear headscarves for religious reasons, it shouldn't make any more difference than in the hypothetical that I gave. Your Honor, on that logic, it also would make no difference if the employer had absolutely no idea that the headscarf was worn for religious reasons, because it would still be a religious headscarf and a religious practice. Not even the EEOC is claiming that there's a duty to accommodate in that situation. And so the question before the Court is, at what level of knowledge does the employer have to have before the duty to accommodate is triggered? For 40 years, the EEOC's own guidance has put the burden to initiate the conversation on the employee, because only the employee knows the rule. Ginsburg. But here the employee had no reason to think that there was anything offensive about her dress. How can she say, by the way, I have a religious reason for wearing this headscarf, when everything from all appearances, the employer doesn't care, it's okay to wear a headscarf? The employer has not given her notice of this look policy, so how is she supposed to intrude the question that as far as all appearances go, it's fine, that she's wearing a headscarf? There's no look policy that the employee knows that's violated? Justice Ginsburg, I respectfully disagree with that characterization of what went on here. Ms. Eloff knew enough about Abercrombie to understand that it had a dress code. Knew enough about Abercrombie to ask in advance. Did she testify she knew they had a dress code? I was not aware of that. She testified that she knew that she would have to wear Abercrombie-style clothes. That's Joint Appendix 23. She knew that Abercrombie did not sell headscarves. But she did, in fact, she came in with an Abercrombie-type shirt, right? She did, but she also knew that Abercrombie did not sell headscarves. That's at Joint Appendix 37 to 38. But she had asked a friend who worked for Abercrombie whether the headscarf was a problem, and the friend said, no, if it's not black, it should be okay. And in fact, three of the four managers said it was okay to wear scarves. So why would she suspect that if she is qualified and has the personality they're looking for and is dressed appropriately, that this company would fail to hire her because they refuse to accommodate her religious belief? Justice Sotomayor, she asked a friend who in turn asked another Abercrombie employee who was not involved in the hiring process, and even the advice that was But I think it was a store manager. But a store manager who was not involved in this hiring process. She had an opportunity before Ms. Cook, who interviewed her, to ask any questions about the look policy after Ms. Cook described the look policy at the interview. Did not mention the headscarf. Did not mention the headscarf. These Abercrombie interviews, in addition to being group interviews, are scripted interviews in which the And show me where in the script, because I remember reading this, and she, in fact, said we don't discuss the look policy at the interview. If you look at Joint Appendix 33 and Joint Appendix 100 to 101, that's Cook's testimony that she read a summary of the look policy and gave Ms. Eloff the opportunity to ask any questions. But there was no mention of a headscarf in what she read. It did not specifically mention the headscarf. However, it described the look policy in general. Ms. Eloff knew before it was a matter of common sense that Abercrombie requires their employees to wear clothes that look like Abercrombie style. Alito, let's say somebody comes in for an interview and this person has the look. If you wanted to, you know, draw the person who has the look, this is the person who has the look. Looks just like this mythical preppy or somebody who came off the beach in California or something like that. Only one problem, the person is wearing a black blouse, which is against the Abercrombie rules. Now, would Abercrombie fire that, not hire that person on the assumption that this person likes black so much this person is going to wear black every single day? I don't think Abercrombie needs to make that assumption about what the person will do later in order to make a judgment based on the person's appearance at the interview. If I walked into an Abercrombie interview wearing a suit, presumably Abercrombie could tell me when you come to work, please don't wear the suit, please wear our clothes. But it would also be equally rational for Abercrombie to say, you know, if this person is coming in wearing a suit, that's not compatible with our style. And likewise for the headscarf. Johnson's testimony, which the EEOC didn't challenge, is that he would have taken the same action for somebody who came into an interview wearing a headscarf, a baseball cap, a helmet, or another religious symbol.  who came into an interview wearing a headscarf, a baseball cap, a helmet, or another religious symbol. Ginsburg. Or a yarmulke, he said specifically. Somebody comes in, applies for a job, wears a yarmulke, no questions asked, that violates our policy. That was his testimony. That's right. And what that shows is that religion is not the basis for the action here. Rather, Abercrombie at most was completely indifferent to religion. No, but that doesn't work in a case like this. It's not a question, are you treating everybody the same? You have an obligation to accommodate people with a particular religious practice or belief. So to keep constantly saying, oh, we would have treated somebody with a baseball cap the same way, it doesn't seem to me it's very responsive. Mr. Chief Justice, for purposes of an intentional discrimination claim, it does matter that you would treat everybody the same, and that's the theory that the EEOC is pursuing here. But it's intentional discrimination because you fail to accommodate. And I would submit that that is an incomprehensible understanding of what intentional discrimination means. Intentional discrimination. Again, how we get into all that, if you want to add something to it, it seems we're in a kind of minutia. What's wrong with saying if he correctly believes that she's religious and needs accommodation, fine, that's the end of it. You're in the statute and proven excuse. A correct belief can arise in a thousand contexts. Did he correctly believe that the drug that was being sold, that white powder, was heroin? Did the manager whom you're trying to fire, and he's saying, did he correctly believe that in fact or didn't pay enough for college graduates, did he correctly believe that this applicant graduated from Princeton? That's Abercrombie. Did he correctly believe that he had authority under the delegation of agency to sign a check? I mean, look, there are thousands of things. Why is it our job here to say what the right way of proving correct belief is? I mean, we can say, say, it's something wrong. You don't have to formulate your correct belief just because she told you. I mean, you can argue that one. That's the only way to prove it, and I'm open to that argument. I'd like to hear it. But once we're beyond that, if I'm right, that that isn't the only way you can prove correct belief, why do we have to say? Because, Your Honor, in this particular context, having a standard like correct belief or suspecting a possible conflict will inevitably lead employers closer to the truth. I'm with you with suspect. Well, that is a suspect. I'm with you only where they correctly believe that. Or understand, da, da, da. Or no. Those three things seem good enough to me. Now, I've repeated this three times, but I want to hear the answer why they're not good enough. The reason they're not, Justice Breyer, the reason that they're not good enough is that there is no way that the employer can know about a religious practice unless it either — unless it is — that information is traceable to the employee. And having that kind of a correct belief standard will inevitably lead employers to stereotype because a fact finder might later find that they should. Well, isn't that what Ms. Cook says she did? She said she saw her in a scarf and that she assumed that it was worn because of religious beliefs. So she acted on a stereotype. Some, I guess, if you wear a black scarf, it's because of a religious belief. Your Honor, I don't believe that she acted on that stereotype. I believe that Johnson instructed her not to hire Ms. Eloff because she was noncompliant with the look policy. No. He hired her because the look — didn't hire her because under the look policy, he believed you could not accommodate that religious belief. I think that the — For that religious practice. I think the reason that he didn't hire her, Joint Appendix 134, is that she simply was not compliant with the look policy. Okay. So the traceable — now you've got me sort of interested in this. It seems to me when you mean traceable to the woman, I mean, you mean it loosely, I guess. It's pretty hard to think of a case where it wouldn't be. I mean, I guess I could imagine a case that he found out about this woman from an FBI agent who was making it up. But I mean, that just seems very, very unlikely. The case that the government gives as an example is one in which an employer learned of an applicant's religious practice from the employer — from the applicant's reference, who was the applicant. And the applicant's reference didn't know the applicant? The applicant's reference did know the applicant. Okay. There it is, traceable.  But the problem with the problem with this case is that it's not traceable to the woman. And so there's a difference in your — I mean, I'm a little — I'm still very confused. You don't think that there could ever be discrimination based on a general, neutral policy, because what does it matter if she told him that this was because of religious belief? If he's only firing her or not hiring her because of the look policy, then he hasn't discriminated. No, Your Honor. If she had told him this is for religious belief and I need an accommodation from the look policy, at that point under the statute, there would be a duty to accommodate. But the question here is, we want to put — I am so totally confused. So he hears it from Ms. Cook, and that's not enough. That's right, because Ms. Cook herself testified that she did not know that Ms. Eloff wore the headscarf for religious reasons. What we want to avoid is a rule that leads employers, in order to avoid liability, to start stereotyping about whether they think, guess, or suspect that somebody is doing something for a religious reason. Ginsburg. But going on through this, all I have to do is say, this is what our look policy is. Do you have any problem with it? As Justice Alito pointed out a while back, don't have to probe anything about religion. I thought Ms. — what's his name, Johnson, but he said, I would do the same thing with a man who came in with a yarmulke. So the man who came in with the yarmulke got the same treatment. Sorry, I was — Ms. Cook, I would want to hire you, but I can't. That was the answer that he gave. So there's no difference between the headscarf or the yarmulke or the seat turban in Mr. Johnson's view. That's right. And to answer your question about why the employer can't just disclose the policy, that isn't a solution, because that is asking employers to treat applicants differently based on stereotypes or assumption about whether something is likely a religious practice. If there's going to be a requirement for the job, then doesn't the employer have an obligation to tell the employee what the job requirements are? No, Your Honor, not under Title VII. Title VII is not a civil service statute that requires applicants or employees who violate workplace rules to be given a chance to explain themselves and told all of the requirements before adverse action is taken against them. Alito, this is what I don't understand about your position with respect to this particular case. As I understand it, Abercrombie does not have a policy that the — that an interviewee must comply with the look policy. Is that correct? The look policy itself does not apply at the interview. It seems that Mr. Johnson's view is that the employee must comply with the look policy. All right. So what are — there would be no reason for not hiring the individual involved here unless you assumed that she was going to wear a scarf every day. Just because she wore a headscarf on that one day wouldn't mean that she necessarily was going to wear it every day. She might — maybe she's just having a bad hair day, so she comes in with a headscarf, but she doesn't have any religious reason for doing it. Would you reject her for that? No. The reason that she was rejected was because you assumed she was going to do this every day. And the only reason why she would do it every day is because she had a religious reason. Justice Alito, that has not been the EEOC's theory of this case. And if it had been, there would have been ways that they could have tried to prove that. They could have questioned Johnson specifically about that. What would he have done if somebody had come in wearing a ball cap? They could have tried to get comparator evidence about what would have happened when people came in wearing nonreligious headwear. And so the EEOC's theory, which it had every opportunity to prove, has not been that Johnson — It doesn't require accommodating to baseball caps, but it does require accommodating to religious practices. So the employer is not, as I said before, is not just, I can't discriminate on the basis of religion, but if there's a religious practice, I must accommodate it. That's a discrete requirement. The premise of Justice Alito's question, as I understood it, is that Abercrombie only didn't hire this person because the headscarf was religious. And what I'm suggesting is Abercrombie might well not have hired anybody who walked in wearing any head covering. And so if the EEOC had wanted to prove the role that assumptions about religion supported. Ginsburg. But why would that be so when you just said they don't require people at the interview stage to conform to the look policy? On its face, the look policy itself does not require that. But Johnson, the decision-maker here, in effect was judging people based on the look policy. Scalia. You were about to tell us what the EEOC's theory of the case was. I was eager to hear that. Could you tell us what you think their theory of the case was? I think their theory of the case was that there was a duty to accommodate a religious practice any time an employer has a correct understanding or a suspicion of that practice. It has not – the theory has not been that Abercrombie acted based on assumptions about Ms. Eloff's religion. And I think one way in which we know that is, let's assume that the look policy did apply at the interview. Under the EEOC's theory, if an interviewer suspected that the applicant, or correctly understood, as Justice Breyer prefers, correctly understood that the applicant wore the headscarf for religious purposes, at that point there would be a duty to accommodate. Regardless of whether Abercrombie did or did not make any assumptions about future compliance, if the look policy applied at the interview, there would be a duty to accommodate upon that correct understanding at the interview. The problem with that rule is that employers, in order to protect themselves in the future from having a jury find that they must have correctly understood that a particular – Sotomayor, so what's the difference between that and having no – I don't understand what you're about to say. Would you finish your thought? The only way that employers can protect themselves under the EEOC's approach is by training their managers to stereotype about possible religious beliefs, because a judge or jury might later find that Abercrombie or an employer correctly understood or must have correctly understood under an objective test, which they don't disclaim and they're amici. But you're essentially saying that the problem with the rule is that it requires Abercrombie to engage in what might be thought of as an awkward conversation to ask some questions. Now, people can disagree about whether one can ask those questions in a way that's awkward at all, but you're saying we should structure the whole legal system to make sure that there is no possibility of that awkward conversation ever taking place. But the alternative to that rule is a rule where Abercrombie just gets to say, well, we're going to stereotype people and prevent them from getting jobs. We'll never have the awkward conversation because we're just going to cut these people out and make sure that they never become Abercrombie employees. Now, between those two options, the option of using a stereotype to make sure that somebody never gets a job and using a stereotype to have an awkward conversation, which does this statute seem to think is the worst problem? Justice Kagan, the problem is not having awkward conversations. The problem is that the EEOC's rule would lead employers to treat people differently based on their religion, which is precisely the opposite of what Title VII wants. The other thing is that Title VII requires them to treat people who have religious practice differently. They don't have to accommodate a baseball cap. They do have to accommodate a yarmulke. But Title VII requires that only after, as the EEOC has said for 40 years, only after the employee or applicant places religion on the table. Title VII does not want employers to be making those judgments before the employee raises the issue. And the concern that the EEOC raises here, that we're going to have applicants who are completely in the dark about work policies, has not been borne out by any case. Breyer, is this right? I've got, I think, your argument. Your argument is it may sound odd to want a special rule as to when you have belief or so forth, but for administrative reasons we have to have it. There are millions of people who are practicing one religion or another where you get a clue of that from their name or maybe their dress or whatever it is. And whenever we have such a person applying, if she doesn't say anything or he doesn't say anything and we don't hire them or we don't do it, we're going to get sued. And we don't want all those lawsuits, and it isn't that big a burden to say to the person who wants the accommodation, tell us. We get into some administrative rule about how to elicit it from her without that simple rule, tell us. We're going to be in a real administrative mess getting sued left, right, and center. Have I got the essence of your argument? That's right. And even asking the neutral-sounding sort of question, can you comply with the work rule, even that is treating applicants differently based on the work rules. Well, that isn't the end of the world, perhaps, but you would say, look, we have thousands of managers and goodness knows they're going to start getting resentful and da, da, da, da, da. I mean, I just want to be sure I've got the argument. That is the essence of it, but part of the reason that I think this is very significant is that under the EEOC's own regulations, if the applicant, if the employer asks the neutral-sounding question and then chooses not to hire the person for a religion for a reason completely unrelated to religion, the EEOC will infer that there was discrimination. And this is such an unusual case because it's very rare that you have an interviewer like Ms. Cook who's honest. And the only reason there was a suit here was because she was honest and came in and told someone else. But if this young woman wasn't about to sue until she heard this information, most people don't presume they're not hired because of some religious practice. But if you have a policy that conflicts with your religious practice and the person knows you're going to wear a yarmulke, then you might get sued. Your Honor, I think many, if not almost all, Title VII cases do originate without any sort of admission by the employer about what the reason was for not hiring the individual. And I think that the rule that places a burden on employers to stereotype and to raise these sorts of issues is one that will undermine the purposes of Title VII. Thank you, counsel. Mr. Gershengorn, you have 5 minutes left. Thank you, Mr. Chief Justice. I'd like to make just two quick factual points to clear up what I took to be some confusion in the record. First of all, there was some discussion about whether, in fact, you needed to comply with the look policy. I point the Court to 94A, which the district court says, 94A of the petition appendix. The policy applies to all store employees, but applicants are not required to be in compliance at the time of the interview. There was some question about whether Cook knew or didn't know about the headscarf. It is crystal clear that she did not know. The district court said it is undisputed — I'm sorry, that Eloff did or did not know. It is undisputed — this is at 97A of the Court's opinion — it is undisputed that Cook did not tell her that Abercrombie would not permit models to wear headscarfs or to wear black clothing. The look policy script, should the Court wish to look at it, is Plaintiffs' Exhibit 4 in the trial. It quotes what the look policy is. I will caution that it is not in the summary judgment record. It was admitted in the damages trial. But the look policy is there, and consistent with all of the testimony, it does not mention headscarfs. Do you want to say a word about what I called his administrative argument? So, Your Honor, I would. And I think the administrative argument actually cuts in our sense, in our favor, in a couple of ways. First of all, the suggestion that there are practical problems isn't plausible. This has been the rule for two decades. The Ninth Circuit, the Third Circuit, the Seventh Circuit, everybody is applying the same test. It's the Tenth Circuit that for the first time has imposed these two new requirements. Second, I don't think it's unadministerable for exactly the reasons we talked about in my first time up here. An employer can structure an interview to make sure that critical rules are followed, and the employer, if it wants, can make no assumptions about religion. Justice Sotomayor, if I could pick up on your point, I think what's important about this case and why we think it's important is precisely that it is unusual. What is unusual is that the applicant found out why she was not hired. And that is what's strange. Most of the time, the person just never finds out that no accommodation was made, that the employer assumed accommodation would be needed, and just never told. And it's precisely why we would find out. Scalia, in a lawsuit, of course. It doesn't, Your Honor, but it's precisely the case. But can surers then find out in the course of the discovery? They certainly could, but they didn't. And it happens often, doesn't it? No, Your Honor, I'm not sure that it does. And I think this is what makes this a very important case. It's because most applicants, unlike employees who are in a position to go back and look at the employer and understand the work rules, applicants are at a serious informational disadvantage. They don't know the work rules. And in this case, it is undisputed that she did not. And if I could just close, then, picking up on something Justice Kagan was pointing at, that the background rule in Title VII is that belief is sufficient. But what makes this case, we think, particularly strong is that this is belief plus an assumption that where they acted on that belief and they assumed that she would need an accommodation from the work rule. That is certainly sufficient, and the Tenth Circuit was wrong to conclude otherwise. Thank you, Your Honor. Thank you, counsel. The case is submitted.